**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THOMAS E. WIMER,                              )
                                              )
            Plaintiff,                        )
                                              )
            v.                                )          Civil Action No. 05-314 Erie
                                              )
JO ANNE B. BARNHART,                          )
Commissioner of Social Security,              )
                                              )
            Defendant.                        )

**<u>MEMORANDUM OPINION</u>**

McLAUGHLIN, J.

        Plaintiff, Thomas E. Wimer, commenced the instant action pursuant to 42 U.S.C. §§

405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of

Social Security denying his claims for disability insurance benefits ("DIB") and supplemental

security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401 *et*

*seq,* and § 1381 *et seq.*  Wimer protectively filed applications for DIB and SSI on May 5, 2003,

alleging disability since December 27, 2002 due to "social problems," knee problems, high blood

pressure and panic attacks (Administrative Record, hereinafter "AR", 50-51, 64, 222-223).  His

applications were denied, and he requested a hearing before an administrative law judge ("ALJ")

(AR 35-39, 219, 224-227).

        Following a hearing held September 15, 2004, the ALJ in a written decision dated

January 28, 2005, found that: (1) Wimer was disabled within the meaning of the Act from

December 27, 2002 to June 10, 2004 based on meeting the severity criteria of Listings 12.04

(affective disorders) and 12.06 (anxiety disorders); and (2) as of June 10, 2004, he regained the

residual functional capacity to perform other work at all exertional levels, with certain non-

exertional limitations, and was no longer disabled (AR 14-23).  Wimer's request for review by

the Appeals Council was denied (AR 5-7), rendering the Commissioner's decision final under 42

U.S.C. § 405(g).  The instant action challenges the ALJ's decision.  Presently pending before the

Court are cross-motions for summary judgment.  For the reasons that follow, we will deny

Plaintiff's motion and grant Defendant's motion.

# I. Background

Wimer was born on August 25, 1979, and was twenty-five years old at the time of the ALJ's decision (AR 15, 50). He has a ninth grade education, with no subsequent education or training (AR 70). He has past relevant work experience as a sales clerk, dishwasher, pizza cook/delivery person, finisher, telemarketer, maintenance worker, vehicle detailer, cleaner, packager, and painter (AR 15, 65).

On April 8, 2003, Wimer was psychiatrically evaluated by Charles Romero, M.D., at the Regional Counseling Center (AR 128-130). He reported that he was unemployed and moving back in with his grandparents because he was afraid to be around the people who lived in his apartment complex (AR 128). Wimer further reported that he suffered from depression with poor concentration, sleep difficulties, feelings of hopelessness, a poor appetite and had suicidal ideations, but denied any plan or intent (AR 128). He described an abusive childhood, which resulted in him being placed in various foster homes or group homes from age seven to thirteen (AR 129). He also reported a past history of illegal drug usage (AR 128).

Dr. Romero reported that Wimer was a very poor historian, was disorganized in his thinking, and had racing thoughts as well as paranoia (AR 128). On mental status examination, Wimer's affect was worried, and his mood was "nervous" (AR 129). His psychomotor activity was anxious with some agitation (AR 129). Dr. Romero noted that his thought process was very loose at times, and he occasionally exhibited some pressure to his speech with anxiety (AR 129). His intelligence seemed to be within normal limits, but his insight and judgment were impaired or limited (AR 129).

Dr. Romero diagnosed post traumatic stress disorder ("PTSD"); major depression, moderate to severe with suicidal ideation; generalized anxiety disorder; dysthymia; agoraphobia; psychotic disorder not otherwise specified; and borderline personality disorder (AR 129-130). Dr. Romero reported that Wimer had gotten to the point where he was willing to be treated and he recommended individual therapy, a partial hospitalization program, and a trial of Zyprexa and Effexor XR (AR 129-130). He assigned him a Global Assessment of Functioning ("GAF") score of 40, and opined that he was still able to function and was not an immediate threat or danger to

himself or others (AR 130).[1]

Wimer returned to the Regional Counseling Center on May 6, 2003 and was seen by Caryn Dudinski, Physician Assistant (AR 127).  Ms. Dudinski reported that Wimer's biggest concern was difficulties with his energy and depression (AR 127).  Wimer reported that he had discontinued the Zyprexa since it made him "too dopey" (AR 127).  He further reported little improvement on the Paxil, but Ms. Dudinski noted that he had only been on the medication for approximately two weeks (AR 127).  On mental status examination, Ms. Dudinski reported that his mood was fair, his affect was somewhat blunted, and his thoughts were concrete and were fairly tangential, but he had some difficulty organizing his thoughts (AR 127).  Wimer denied any suicidal/homicidal ideation or psychotic symptoms (AR 127).  Ms. Dudinsky recommended the continuation of the Paxil and added a trial of Wellbutrin, with consideration of a different anti-psychotic medication being added in the future (AR 127).

Wimer was seen by David J. Fontaine, D.O., on June 11, 2003 for a medication management visit (AR 126).  Dr. Fontaine discontinued the Paxil since Wimer had jitteriness and a certain amount of twitching (AR 126).  He continued the Wellbutrin since it helped with his functioning and concentration (AR 126).  Dr. Fontaine reported that Wimer was somewhat nervous and appeared to be having some anxiety (AR 126).  He prescribed Klonopin (AR 126).

On June 14, 2003, Wimer was admitted on a 302 from UPMC Northwest for an attempted suicide (AR 156).  On psychiatric evaluation, he reported to Sheila Khatri, M.D., that he had been going to the Regional Counseling Center for the last four or five months (AR 156).  He indicated that he had suffered from suicidal thoughts for the past week (AR 156).  He took an overdose of Klonopin and drank alcohol and tried to hang himself on a tree, but fell and walked himself to ImmediaCare (AR 156).  Wimer described his difficult childhood, drug and alcohol use, and a past shoplifting incident (AR 157).  He complained of difficulty concentrating, racing

---

[1]The GAF score considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness.  Scores between 31 and 40 indicate "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; ...)."  *See Diagnostic and Statistical Manual of Mental Disorders: DSM-IV-TR* 34 (4th ed. 2000).

thoughts, nervousness, anxiousness and confusion (AR 156).

On mental status examination, Wimer exhibited poor eye contact and hygiene (AR 157). He denied any active suicidal thoughts, but stated he still did not want to live (AR 157). His speech was circumstantial at times and over-inclusive, but was not pressured or rapid (AR 157). He had significant trouble with memory and concentration, his mood was sad with psychomotor retardation, his affect was tearful, and his insight and judgement were limited (AR 157). Dr. Khatri diagnosed major depression, not otherwise specified, polysubstance abuse by history, and stressors consisting of relationship issues, unemployment, finances, and mental health issues, and assigned him a GAF score of 25 (AR 158).[2] Wimer was started on Lexapro and Risperdal, and it was recommended that he attend individual and group therapy sessions (AR 158).

While undergoing inpatient treatment, Wimer reported that he still had suicidal thoughts, racing thoughts and was hearing voices (AR 177). After two days on medications however, he became less withdrawn and was observed smiling and laughing (AR 172). Although he requested a medication change since he did not like how he felt, his mood was reported as good, and he was pleasant and cooperative (AR 172). Wimer was discharged on June 19, 2003 by Harshad Patel, M.D., who reported that his mood was brighter (AR 161). His insight, however, was fair to poor, and his judgement was fair (AR 161). Dr. Patel recommended that he continue his medications, and referred him to the partial program at the Regional Counseling Center (AR 161).

Wimer returned to Dr. Fontaine for follow-up on July 16, 2003 (AR 125). Dr. Fontaine reported that Wimer was still experiencing depression and had ups and downs similar to a roller coaster, and his panic and anxiety symptoms seemed to be more difficult for him (AR 125). He switched his medication to Effexor, noting that Wimer had not given it a chance to work in the past, and continued the Klonopin (AR 125).

On July 21, 2003, Wimer was again admitted to UPMC for snorting an overdose of Klonopin (AR 159). Dr. Patel noted that Wimer went to the partial program for one day, was not

---

[2]Scores between 21 and 30 indicate that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends)." *Id.*

compliant with treatment or medication, and was abusing marijuana (AR 159). Wimer reported feeling more depressed, sad, hopeless, and helpless about his situation (AR 159). He reported he had no transportation or place to live, so he had to live with his grandmother, was unemployed and had money problems (AR 159). On mental status examination, Dr. Patel reported that Wimer appeared to be very depressed, his affect was congruent, he had poor insight and judgment, and had a paucity of suicidal ideations (AR 159). Dr. Patel further reported that he had no thought disorders and was a "little more manipulative" (AR 159). He diagnosed bipolar disorder not otherwise specified, prescription drug dependence and abuse, and history of marijuana dependence and abuse, and assigned him a GAF score of 20 (AR 159).[3]

Two days after restarting his medication, Wimer reported that he felt better with increased energy (AR 133). Progress notes indicated that his mood was good, his affect appropriate, had good interactions and his appetite was good (AR 113). Wimer denied any depression or problems with anxiety (AR 113). Although he felt ready to go home, his grandmother did not feel he was ready to return home (AR 113). Wimer was discharged on July 25, 2003 on Depakote, Risperdal, Wellbutrin, and Remeron (AR 118). It was recommended that he follow-up with the Regional Counseling Center for medication management and usual counseling, and appointments were scheduled for August 6, 2003 and August 12, 2003 (AR 118).

Wimer returned to the Regional Counseling Center on August 11, 2003, reporting continued depression, but less anxiety and no difficulties with panic attacks (AR 123). Ms. Dudinsky reported his mood as fair, and his affect was generally appropriate (AR 123). He interacted well and was more outgoing, his thoughts were fairly coherent, and he denied any suicidal ideation or psychotic symptoms (AR 123). Ms. Dudinsky indicated that he had some improvement with his current medication regime, but had some over sedation (AR 123). She discontinued the Depakote and continued his other medications (AR 123).

On August 27, 2003, Wimer underwent a clinical psychological disability evaluation conducted by Robert P. Craig, Ph.D., pursuant to the request of the Commissioner (AR 131-136).

---

[3]Scores between 11 and 20 indicate "[s]ome danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)." *Id.*

On mental status examination, Dr. Craig reported that Wimer presented with some symptoms of depression, but he was attentive, cooperative and alert; he behaved appropriately, made good eye contact, and displayed no indication of thought disorder (AR 132-133). Dr. Craig diagnosed major depressive disorder, recurrent, mild; panic attacks without agoraphobia; rule out post traumatic stress disorder, and assigned him a GAF score of 55 (AR 133).[4] Dr. Craig opined that Wimer could handle repetitive tasks without any significant difficulty, but would have difficulty handling stress and interpersonal contact (AR 134).

On September 10, 2003, Wimer returned to Dr. Fontaine for follow-up (AR 211). He reported that he stayed fairly busy helping his grandparents "refinish his store" (AR 211). Dr. Fontaine reported that he seemed to be doing fairly well, was well groomed, expressed himself well, exhibited a decent affect and fair mood (AR 211). Dr. Fontaine formed an impression of depression, moderate and severe, with no suicidal ideation, with a moderate amount of generalized anxiety disorder (AR 211). He continued his medication regime, and suggested that Wimer take his medications earlier to avoid tiredness during the day (AR 211).

On October 22, 2003, Manella C. Link, Ph.D., a state agency reviewing psychologist, reviewed the medical evidence of record and opined that Wimer's depression, anxiety, and substance abuse disorders were severe, but not expected to last 12 months (AR 137-152). Dr. Link adopted Dr. Craig's assessment and accorded it great weight (AR 152).

On November 26, 2003, Wimer reported that his difficulty being around people had worsened (AR 210). Dr. Fontaine reported that his antidepressants were "working quite well" and Wimer's mood was improved (AR 210). He increased his Risperdal dosage (AR 210).

Wimer returned to the Regional Counseling Center on May 17, 2004 and was seen by Ms. Dudinsky (AR 209). Wimer reported that he discontinued the Remeron and Risperdal on his own since they made him feel too tired and gave him a funny feeling (AR 209). He further reported that he still took the Wellbutrin, which helped his mood (AR 209). He was a bit more down lately, and had just broken up with his girlfriend (AR 209). Ms. Dudinsky reported that his

---

[4]Scores between 51 and 60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

mood was fair, and his affect was a bit down, but he had generally appropriate thoughts which were fairly coherent (AR 209). He denied any suicidal/homicidal ideations or psychotic thoughts (AR 209). Ms. Dudinsky found no evidence of psychosis or disorganized thinking despite him discontinuing his antipsychotic medications (AR 209). She further found that he continued not to meet the criteria for manic episode (AR 209). She continued his Wellbutrin and added a trial of Prozac (AR 209).

Treatment notes from Wimer's primary care physician reflected that his mood was "pretty good" in May 2004, and in June 2004 he had "more ambition" (AR 180-182).

On July 12, 2004, Wimer reported that overall he was doing quite well (AR 208). He complained that the Prozac made him "edgy" at first, but since he had adjusted the medication, he felt it was somewhat helpful in calming his anxiety (AR 208). Ms. Dudinsky reported that his mood was fair and his affect was a bit withdrawn but generally appropriate, his thoughts were coherent, and he had no suicidal/homicidal ideations or psychosis (AR 208). His disorganized thinking continued to be absent with no psychotic medications (AR 208). Wimer's biggest concern was his energy level and anxiety (AR 208). Ms. Dudinsky continued his Wellbutrin and increased his Prozac dosage (AR 208).

On September 3, 2004, Wimer's grandmother wrote a letter to the ALJ and described his past family history, and explained that his problems and expenses had drained them both physically and financially (AR 106). She also included a list of her personal observations relative to his positive and negative behavior patterns (AR 106).

In an undated letter, Larry Tripp, an acquaintance of Wimer's, wrote a letter to the ALJ stating that Wimer had difficulty interacting with groups of strangers, and that his medication did not seem to help prevent anxiety towards people (AR 108).

Finally, on September 7, 2004, Wimer's therapist, Joseph Santus, completed a residual functional capacity assessment (AR 195-207). Mr. Santus opined that Wimer had moderate limitations in concentration, persistence, social interaction and adaption (AR 195-197). He stated that although Wimer was not observed in a work setting, there were some concerns about his social anxieties that could impair his work performance (AR 198).

Wimer and Joseph Kuhar, a vocational expert, testified at the hearing held by the ALJ on September 15, 2004 (AR 237-268). Wimer testified that he had lived alone in a trailer since October 2003 (AR 240). He claimed that all of his prior jobs were of short duration because he had trouble being around people (AR 242-243). He stated that he continued to take Wellbutrin and Prozac, although at slightly lower degrees, and he no longer used illegal drugs (AR 245). He spent his days mostly reading and studying for his GED; he also walked in the woods with his dog, engaged in woodcarving, painted and played the guitar (AR 246). In addition to his grandmother, he saw two or three close friends once or twice a week (AR 246). They would study, camp or play music together (AR 246). Wimer claimed that being around people caused his heart to beat fast and caused an upset stomach (AR 246). He was compliant with his medications which helped "quite a bit" with his ability to concentrate (AR 247). Wimer also testified to his abusive family history (AR 250-255).

The vocational expert was asked to consider an individual of Wimer's age, education, and vocational background, who was limited to performing only simple instructions and simple, repetitive tasks, who must avoid working in close proximity to others, intensive supervision, work setting changes, decision-making, working at a competitive production rate of pace, or work with the general public (AR 261-263).[5] The vocational expert testified that such an individual could perform the jobs of a laundry worker, janitor and an office cleaner (AR 261-262).

Following the hearing, the ALJ issued a written decision which found that Wimer was disabled from December 27, 2002 to June 10, 2004 based on the severity criteria of Listings 12.04 and 12.06, but that as of June 10, 2004 he regained a residual functional capacity to perform other work with some limitations and was no longer disabled (AR 14-23). His request for review by the Appeals Council was denied making the ALJ's decision the final decision of the Commissioner (AR 5-7). He subsequently filed this action.

---

[5]There is a portion of the transcript where the hypothetical question posed to the vocational expert was recorded as "inaudible" (AR 261-265). However, we can fairly infer, from the portion of the transcript that is available, that it is consistent with the ALJ's residual functional capacity finding set forth in his decision. Moreover, neither party has advanced any error in this regard.

## II. STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)); *see Richardson v. Parales,* 402 U.S. 389, 401 (1971). It has been defined as less than a preponderance of evidence but more than a mere scintilla. *See Richardson,* 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.,* 48 F.3d 114, 117 (3d Cir. 1995).

## III. DISCUSSION

Title II of the Social Security Act provides for the payment of disability insurance benefits to those who have contributed to the program and who have become so disabled that they are unable to engage in any substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). Title XVI of the Act establishes that SSI benefits are payable to those individuals who are similarly disabled and whose income and resources fall below designated levels. 42 U.S.C. § 1382(a). A person who does not have insured status under Title II may nevertheless receive benefits under Title XVI. *Compare* 42 U.S.C. § 423(a)(1) *with* 42 U.S.C. § 1382(a). In order to be entitled to DIB under Title II, a claimant must additionally establish that his disability existed before the expiration of his insured status. 42 U.S.C. § 423(a), (c). The ALJ found that Wimer met the disability insured status requirements of the Act through the date of his decision (AR 24). SSI does not have an insured status requirement.

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical

impairment, the [Commissioner] determines (3) whether the
impairment is equivalent to an impairment listed by the
[Commissioner] as creating a presumption of disability. *Bowen,*
482 U.S. at 141. If it is not, the claimant bears the burden of
showing (4) that the impairment prevents him from performing the
work that he has performed in the past. *Id.* If the claimant satisfies
this burden, the [Commissioner] must grant the claimant benefits
unless the [Commissioner] can demonstrate (5) that there are jobs
in the national economy that the claimant can perform. *Ferguson
v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117.

As previously indicated, the ALJ found that during the closed period of disability

(December 27, 2002 to June 10, 2004), Wimer's PTSD and depressive and anxiety disorders met

the "B" criteria of Listing 12.04 (affective disorders) and Listing 12.06 (anxiety disorders) (AR

22).[6] Following this period however, the ALJ concluded that he regained the residual functional

capacity to perform work at all exertional levels, but due to his mental impairments, he was

limited to work involving only simple instructions and simple, repetitive tasks (AR 22). The

ALJ further concluded he should avoid working in close proximity to others, intensive

supervision, work setting changes, decision-making, working at a competitive production rate

pace, and working with the general public (AR 22). He determined that as of June 10, 2004,

Wimer was able to perform the jobs cited by the vocational expert at the administrative hearing

(AR 22). Again, we must affirm this determination unless it is not supported by substantial

evidence. *See* 42 U.S.C. § 405(g).

As an initial matter, we must determine whether additional evidence submitted for the

first time to the Appeals Council should be considered by the Court in our review. The evidence

presented to the Appeals Council consisted of Regional Counseling Center records dated from

April 8, 2003 through June 23, 2005; treatment records from Dr. Romero dated December 17,

2004 and March 14, 2005; and a letter from Wimer's social worker, dated June 23, 2005 (AR

230-236).

---

[6]The ALJ further found that Wimer's history of substance abuse was not a contributing
factor material to the determination of disability (AR 22).

In *Matthews v. Apfel*, 239 F.3d 589, 593 (3rd Cir. 2001), the court held that a district court was precluded from considering evidence that had not been submitted, in the first instance, to the ALJ, in the absence of a finding that: (1) the additional evidence was "new"; (2) it was "material" to a determination of the claimant's disability benefits claim; and (3) there was "good cause" for the claimant's failure to present the new evidence in a prior proceeding. *Matthews*, 239 F.3d at 593 ("[W]hen [a] claimant seeks to rely on evidence that was not before the ALJ, the district court may remand to the Commissioner but only if the evidence is new and material and if there was good cause why it was not previously presented to the ALJ.").

### A.   Regional Counseling Center records

The Regional Counseling Center records contain notations that Wimer attended individual and/or group counseling sessions from April 8, 2003 through June 23, 2005 (AR 231-234). This evidence is neither new nor material, and is merely cumulative of the evidence that was before the ALJ. It is undisputed that Wimer attended counseling sessions, and a portion of this evidence was already a part of the administrative record. *See Szubak v. Sec'y of HHS,* 745 F.2d 831, 833 (3rd Cir. 1984) ("evidence must be 'new' and not merely cumulative of what is already in the record").[7]

### B.   Dr. Romero's treatment notes

Dr. Romero's treatment note of December 17, 2004, show that Wimer reported that he was doing fairly well (AR 235). He stated that he was getting some pre-college work out of way and was hoping to start college (AR 235). He was receiving tutoring in math and reported he was making progress (AR 235). Dr. Romero noted that Wimer was doing fairly well with his mood on the Prozac/Wellbutrin combination, and that the Wellbutrin had helped with his

---

[7]In his Motion and Brief, Wimer claims that the ALJ erroneously determined that the last date he received any mental health treatment was June 10, 2004, and that these records demonstrate the contrary. *See Plaintiff's Motion* p. 3*; Plaintiff's Brief* pp. 4-5. Wimer's reliance on these records, however, is misplaced, since the ALJ's finding that June 10, 2004 was the last date any treatment took place was in reference to treatment for his alleged *physical impairments,* which are not at issue in this case (AR 17).

disorganized thinking (AR 235).  Dr. Romero found that overall he was "doing well" except for difficulty remembering the second dose of Wellbutrin (AR 235).

On mental status examination, Dr. Romero reported that Wimer's mood was good, his affect was friendly and euthymic, he was cooperative, and his thoughts were coherent (AR 235). His intelligence was within normal limits, and he had no suicidal/homicidal ideations or psychosis (AR 235).  Dr. Romero stated that he seemed to be getting his life together and planning on a future (AR 235).  He adjusted his medications, and recommended he continue seeing his therapist and return for follow-up in two to three months (AR 235).

This evidence is not material in the sense that there is a "reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Szubak*, 745 F.2d at 833.  Dr. Romero's treatment note in December 2004 actually supports the ALJ's determination that Wimer was not disabled after June 10, 2004.  Dr. Romero found that Wimer was "doing well" and seemed to be getting his life together (AR 235).  His mood was good, his affect was friendly and euthymic, he was cooperative, and his thoughts were coherent (AR 235). Dr. Romero noted that his disorganized thinking had improved on the Wellbutrin, and Wimer himself reported that he was doing well (AR 235).

Moreover, Wimer has failed to demonstrate good cause for not presenting this record  to the ALJ for his consideration. *Matthews*, 239 F.3d at 593-95 ("[W]e believe that it is a much sounder policy to require claimants to present all material evidence to the ALJ and prohibit judicial review of new evidence unless there is good reason for not having brought it before the ALJ.").  The only explanation offered by Wimer as to why this evidence was not submitted to the ALJ is that it was not in his possession, and he was not aware that there would be an issue regarding his entitlement to benefits after June 10, 2004. *See Plaintiff's Brief p. 7.*  However, Wimer was represented by counsel at the hearing who was aware of the existence of this record, but did not request that the record remain open long enough to obtain the record, even if it was not available as of the date of the hearing.  Moreover, even if Wimer did not understand the

significance of this record, he should have.  *See Matthews,* 239 F.3d at 595 (deciding it was not

good cause where plaintiff "did not realize the importance of obtaining a vocational evaluation"

because she "should have known that her ability to work was an issue at the ALJ hearing ... .").

Here, Wimer was claiming disability since December 27, 2002 and should have known that such

record would be relevant.

Dr. Romero's remaining treatment note dated March 14, 2005, revealed that Wimer

continued to do well and was active, and was inquiring about tapering off his Prozac (AR 236).

He continued to be tutored in math while pursuing his GED, so he could go on to college and

learn about art and making musical instruments (AR 236).  On mental status examination, Dr.

Romero reported that his mood was good, his affect was bright, he was friendly and cooperative,

his thoughts were nicely organized, his intelligence was within normal limits, and he had no

suicidal or homicidal ideations (AR 236).  His thinking was organized and functioning and was

doing well on just two medicines (AR 236).  Dr. Romero stated that overall, he was doing "very,

very well" and recommended he continue to see his therapist and return for follow-up in two to

three months (AR 236).

With respect to this treatment note, we find it is immaterial since it does not relate to the

time period for which benefits were denied.  *See, e.g., Wilson v. Halter,* 2001 WL 410542

(E.D.Pa. 2001), *aff'd in an unpublished opinion,* 2002 WL 130415 (3rd Cir. 2002) (medical

reports relating to period of time after that addressed in the hearing are immaterial to the ALJ's

decision and therefore do not warrant remand); *Ordo v. Apfel*, 2001 WL 1159856 (E.D.Pa. 2001)

(remand not appropriate since new evidence did not relate back to time period for which benefits

were denied).

### C. Terry Slinghuff report

The letter from Wimer's social worker, Terry Slingluff, dated June 23, 2005, stated that

he had treated Wimer since December 2004 (AR 230).  He reported that Wimer presented at

times with disabling anxiety attacks triggered in normal social contexts punctuated by periods of

withdrawal and depression (AR 230).  He noted that Wimer had made gradual progress in terms of self maintenance, and had begun to work on some long term goals such as obtaining a GED and a higher education (AR 230).  However, he felt that this gradual progress would take years, not months (AR 230).  Mr. Slingluff opined that Wimer's functioning was stable given a low stress environment, but he did not believe that he was a candidate for competitive employment in the foreseeable future (AR 230).  He was of the opinion that pushing him into a competitive environment would likely be counter productive (AR 230).

To the extent that his opinion relates to the time period after the ALJ's decision, it is immaterial.  *Wilson v. Halter*, 2001 WL 410542 (E.D.Pa. 2001), *aff'd in an unpublished opinion,* 2002 WL 130415 (3rd Cir. 2002); *Ordo v. Apfel*, 2001 WL 1159856 (E.D.Pa. 2001).  Moreover, since this opinion is not from an acceptable medical source, the ALJ could have properly discounted it in any event.  *See* 20 C.F.R. § 416.913(a); *Hartranft v. Apfel*, 181 F.3d 358, 361 (3rd Cir. 1999).  Finally, for the reasons previously discussed, Wimer has failed to demonstrate good cause for not presenting Mr. Slingfuff's report to the ALJ for his consideration.

In sum, because the requirements for a remand are not satisfied with respect to the additional evidence submitted, we find that a new evidence remand is not warranted.  We now direct our attention to Wimer's argument relative to the evidence that was before the ALJ.  Wimer fundamentally takes issue with the ALJ's finding that he can perform work with certain restrictions, and argues that the ALJ failed to present substantial evidence of sufficient medical improvement in his condition after June 10, 2004.  *Plaintiff's Brief* p. 6.

As previously indicated, the ALJ determined the Wimer was disabled from December 27, 2002 to June 10, 2004, but not thereafter.[8]  Whenever the Commissioner has determined that disability should be limited to a specified period, "[f]airness would certainly seem to require an

---

[8]In a "closed period" case, "the decision-maker determines that a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of his decision."  *Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002), *quoting Pickett v. Bowen*, 833 F.2d 288, 289 n.1 (11th Cir. 1987).

14

adequate showing of medical improvement ... ."  *See Chrupcala v. Heckler*, 829 F.2d 1269, 1274 (3rd Cir. 1987) (applying medical improvement standard in a closed period case).  Thus, in a closed period case such as this one, a claimant who experiences medical improvement related to his ability to engage in work may lose his eligibility to receive benefits if there is an improvement in his condition.  42 U.S.C. § 1382c(a)(4)(A)(i); 20 C.F.R. §§ 404.1594, 416.994.  "Medical improvement" is defined as "any decrease in the medical severity of [the claimant's] impairments which [were] present at the time of the most recent decision that [the claimant] was disabled. ..." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1)(i).

Here, we find that substantial evidence supports the ALJ's finding that Wimer experienced medical improvement.  As the ALJ's decision reveals, the ALJ compared Wimer's "marked" difficulties in mental functioning during the closed period, to Wimer's "moderate" limitations in the same areas of functioning after the closed period (AR 17, 19).  The ALJ found that Wimer's ability to socialize and concentrate had improved since June 10, 2004 (AR 18).  He noted that Wimer testified that he was able to concentrate and study for his upcoming GED examination, was able to live alone, care for his dog, play music and camp with two friends, ride his bike and play the guitar, and remained abstinent from drug use (AR 18).

The ALJ further found persuasive Drs. Craig and Link's assessments rendered in 2003 (AR 18).  Dr. Craig found Wimer could handle repetitive tasks without any difficulty, although he would have some difficulty handling stress and interpersonal contacts (AR 134).  As noted by the ALJ, Dr. Link, who reviewed and adopted Dr. Craig's assessment, opined that Wimer was only moderately limited in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with others without being distracted; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace; accept instructions and respond appropriately to criticism from supervisors; maintain socially

appropriate behavior; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others (AR 18-19, 150-151).

All of these findings are supported by the record. Significantly, we observe that although Dr. Link opined that Wimer's impairments were severe and he was moderately limited in a number of areas, he nonetheless concluded that he would make a satisfactory recovery *before* the completion of the 12 month duration period (AR 152) (emphasis added). Treatment notes from Wimer's treating physicians' substantiate medical improvement. Shortly before the expiration of the closed period, Wimer reported to Ms. Dudinsky in May that the Wellbutrin helped his mood, and she noted his mood was fair and his affect a bit down, but he exhibited appropriate, coherent thoughts (AR 209). He experienced no psychosis or disorganized thinking despite discontinuing his antipsychotic medications (AR 209). Treatment notes from his primary care physician showed that his mood was pretty good and by June 2004 he had "more ambition" (AR 180-182). Wimer reported in July 2004 that he was doing quite well and the Prozac had been helpful in calming his anxiety (AR 208). His thoughts were coherent, he had no suicidal/homicidal ideations, and disorganized thinking continued to be absent with no psychotic medications (AR 208).

We further reject Wimer's argument that the ALJ erred in assigning little weight to the opinion of Mr. Santus rendered in September 2004 that his social anxieties could impair his work performance (AR 17, 198). It is undisputed that as a therapist, Mr. Santus is not an "acceptable medical source" whose opinion is entitled to controlling weight, *see* 20 C.F.R. § 416.913(a), and therefore, the ALJ could properly reject his opinion. Moreover, the fact that social anxieties "could" impair Wimer's performance does not lead to the conclusion that he was incapable of performing *any* substantial gainful activity. Indeed, Mr. Santus qualified his opinion in this regard by stating that although he some "concerns" in this area, he had not observed Wimer in a work setting (AR 198).

Finally, Wimer argues that the ALJ erred in failing to mention or give proper

consideration to the letters he submitted from his grandmother and an acquaintance which set forth observations relative to his functional abilities. Wimer's grandmother indicated that Wimer suffered from fragmented thinking, anxiety, nervousness around people, and concentration problems (AR 106-107). Likewise, Wimer's friend stated that he had difficulty interacting with people and suffered from anxiety (AR 108). Although the ALJ did not mention these letters, we nonetheless find that a remand is not dictated under the facts of this case. These letters contain information that is merely cumulative of other evidence already in the record. *See, e.g., Sherrer v. Apfel*, 2000 WL 233241 at *3 (E.D.Pa. 2000) (remand or reversal not required where ALJ failed to discuss letters from claimant's husband and friend since information contained therein was cumulative of other evidence in the record). Moreover, the ALJ accommodated all these limitations in his residual functional capacity assessment by limiting Wimer to jobs requiring simple instructions and simple repetitive tasks, and recognizing that he must avoid working in close proximity to others, intensive supervision, work setting changes, decision-making, working at a competitive production rate pace, and working with the general public. We therefore find no error in this regard.

### IV. CONCLUSION

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

THOMAS E. WIMER,          )
                                   )
        Plaintiff,          )
                                   )
          v.            )          Civil Action No. 05-314 Erie
                                   )
JO ANNE B. BARNHART,     )
Commissioner of Social Security,   )
                                   )
        Defendant.     )

## <u>ORDER</u>

     AND NOW, this 11th day of April, 2006, and for the reasons set forth in the accompanying Memorandum Opinion,

     IT IS HEREBY ORDERED that the Plaintiff's Motion for Summary Judgment [Doc. No. 8] is DENIED, and the Defendant's Motion for Summary Judgment [Doc. No. 11] is GRANTED.  JUDGMENT is hereby entered in favor of Defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against Plaintiff, Thomas E. Wimer.  The clerk is directed to mark the case closed.


                                     s/ Sean J. McLaughlin
                                     United States District Judge

cm: All parties of record.